4-16-0406 Jason Hanson v. Ball-Chatham Community Unit School District 5 Appearing for the appellant is Attorney John Baker and for the appellee is Attorney David Hennessey. Good afternoon. Mr. Baker, you are ready to proceed. I am. You may. Thank you, Justice Harris. May it please the Court. Mr. Hennessey. Mr. Burkett. My name is John Baker, and on behalf of my client, Jason Hanson, I am here today to ask this Court to reverse a grant summary judgment that was entered against Mr. Hanson by the Circuit Court of Sangamon County. This is a case of disparate treatment. This is a case that is brought under the Illinois Human Rights Act, alleging gender discrimination. What we have here are two individuals, two employees, who were both involved in the same circumstance, but yet two very different punishments were meted out. Our view, and we believe the proper view, is that the evidence is such that there are critical disputes of fact, and that the Circuit Court was wrong to find that as a matter of law, a jury could not permissibly find in our favor. I know the Court is familiar with the facts, but I will give a very brief overview. Almost four years ago to this day, Jason was working as an SRO, a school resource officer at the middle school in Chatham, Illinois. This was a part-time job, Jason. He was employed full-time as a sheriff's deputy for Sangamon County. He worked out there about 20 hours a week. He had been doing that for more than 10 years. At the time, his performance evaluations were outstanding. Not one issue. They were glowing. You couldn't ask for a better employee. There was nothing in his file to suggest that there were any problems with his performance. In early January of that year, one day Jason was at school doing his job. He had a laptop computer, and it was a personal laptop computer. It was not a school district laptop. He took it to a coworker, a woman who worked at the school by the name of Yvette Jones. And Ms. Jones worked in information technology. Jason took the computer to her and essentially said, Hey, Yvette, I've had some issues with my personal computer. Do you think you could fix that for me? Yvette did some work and ultimately was able to fix it. Yvette and Jason were in the room together, and we don't know exactly the time. Both of them say they don't recall how long. Estimates have ranged anywhere from 20 to 30 to 40 minutes. We don't know. No one knows how long. We do know that it was less than one class period. Both of them immediately, an investigation was launched into what the two of them were doing in that room together. This went on for a series of days, a series of interviews between the two, and when the dust had settled, Jason had been terminated from his job, whereas Ms. Jones had not. She received a one-day suspension. The question is, based upon those facts and many other facts in the record, could a jury reasonably infer that gender played a role in that decision? Well, in order to get there from a legal perspective, we have to look at the traditional McDonnell-Douglas factors that have been established by the United States Supreme Court and the United States Court of Appeals for the Seventh Circuit and adopted by our Supreme Court as well. What we look at in making that assessment is we look first to see, can a plaintiff establish a premature action case? If so, it becomes incumbent upon the employer to make a justification for their actions. Once that is done, it's incumbent upon the employee to outline why it is that a finder of fact could conclude that those statements aren't true. Not necessarily that they're discriminatory, but not true. This is what the Supreme Court established as the indirect method of evidence. You don't have to have the smoking gun. You don't have to have direct evidence of discrimination. Rather, you need this indirect evidence that McDonnell-Douglas had outlined. So in a case like this, we look to the Prima Facie case of disparate treatment for employees. And this is where the circuit court made a tremendous mistake. And I think it can't be highlighted enough. There were factual findings, and there was a legal mistake on this as well. In looking to see if there's a Prima Facie case, we look to the two employees, and we look to see who the people who were involved in the decision-making. And were these two similar, or were they the same? The district has always maintained that, no, no, it was not the same people. They maintain that a man named Randy Allen made the decisions for Jason, but for another man by the name of Chad Kent made the decisions on behalf of Yvette Jones. And that's the basis. That's why the two of them were treated differently, because you had two different people making recommendations on what should be done, and that ultimately is what was carried out. Now, if we were to assume for a moment that factually that was true, or if we would assume, I suppose, more correctly, that the evidence compelled that factual finding, we want to first look at what the law says on that. And I think that the most appropriate case to start with is the Coleman v. Donahoe case, which is a 2012 case from the United States Court of Appeals for the Seventh Circuit. I think both sides have addressed it throughout our briefing. But it talks about this very issue, about somebody who makes a recommendation and somebody who makes the decision. And what the court said there, the issue is not only who proposed the discipline, but who was responsible for it. In other words, who had the authority to make that recommendation? Well, in this case, even if we assume that Randy Allen would have made this recommendation, he was not the one who had the authority to make it to the school board. That was Carrie Ruby. She was the superintendent, and in fact, she is the one who made the recommendation to the school board. That's the same person who made the decision on Yvette Jones. Both of them were made by Carrie Ruby. And for the circuit court to conclude otherwise is a misreading of law. But it's also a misreading of the facts. The district has repeatedly argued that Mr. Allen was Jason Hansen's supervisor, but he wasn't. And this is a dispute of fact. To support the fact that he wasn't Mr. Hansen's supervisor, we pointed out the fact that every one of Jason's evaluations over 11 years, not one of them was signed off on by Randy Allen. They were all signed off on by the building principal. In his job description. Did he testify at his deposition that Allen was the supervisor? No. No, he did not, Justice Steinman. That is taking a snippet out of what he said. And in response to that. I don't understand what that means, taking a snippet out of what he said. Either he said it or he didn't say it. If you were to distort the context of what he said and cut it down to one line, you could say that he said that. However, I would ask the court. And we've outlined the specific passage, I believe, in my reply brief. On page five of my reply brief. And it goes through exactly what that line of questioning was. And so it's all there. And he is emphatically denied that Allen had supervisory authority over him. Jason set his own schedule. He hardly ever saw Randy Allen. Randy Allen never sent any documentation to him. None of those things ever happened. There's no evidence to suggest that it did. We have, again, the job description that says he's not the supervisor. Now, taking all of these things collectively. And I think that even if you read through what Jason said during his deposition, he has raised that dispute. And certainly if you read through what he says in his affidavit, he has raised that dispute. Was he essentially a security guard? No. I don't believe that he was. And there were certainly security aspects to his job. But he was not what you would think of as a security guard. He was plain clothed at all times. He did have a gun. However, the gun was concealed. No one knew that he had the gun. He dealt with a lot of issues that had nothing to do with security. In fact, most of them didn't have anything to do with security. He was a monitor in the halls during passing periods. He would go if there were problems with the students during the course of the day. They would send him down to go get the student and bring the student to the office. Those sorts of things. Now, if there were a security issue, he would have dealt with it. There's no question about that. And in order for him to deal with that, he had a radio that he used so that he could be communicated with anywhere he was in the building. And one of the points that we raised throughout our briefs and throughout our arguments before was what Jason did on that day in sitting down and talking to Yvette Jones was really no different than what he did on a lot of other days. That was technically probably a violation of a rule. True. And the reality is if Yvette Jones was fired and Jason Hansen was fired, we wouldn't be here because they would have been treated the same. But that's not what happened. These are the things that he would do. He would sit there and he would chat with other people who worked at the school. He would stop by classrooms. He would spend a good deal of his time at the main office doing computer work. The suggestion that he was supposed to be continually patrolling the halls is not based upon the facts, or at least if it's disputed fact. And he had a radio to deal with that. The way the middle school operated was there was a – when you wanted to go into the building, you would push the button and there would be a camera that would direct it to the office. Whoever was in the office, the receptionist would push the person in and the person would go to the office to check in. And so the security component, yes, there was a security component. But to suggest that he was supposed to be purely providing security simply is not accurate. One of the other things he would do every morning, he would go around and make sure all the doors had been locked at the end of the day, help get the kids off the bus – or, excuse me, onto the bus after school. Those were the sorts of things that he did. So there were many components to it. And I think that his affidavit goes into great detail on that, on what he actually did. There's also his job description. But, you know, there certainly was a security component to what he did. But that wasn't only what he did. The other issue was saying that Randy Allen was the decision maker. And, again, this goes back to a factual dispute. According to Jason – again, this is summary judgment, so we have to take what he says as accurate. But according to Jason, he talked to Randy Allen, and Randy Allen told him, hey, look, they're going to fire you. They want you gone. And he kept referring to them. And I've outlined that conversation, referring to Ruby and the other upper echelon at the school district, that they were going to take that action against him. Does it explain why they wanted him gone? At that time? Yes. I don't believe that it was, Justice Steigman. And, again, my detail and my memory of the facts might be a little off on that. But that's what he said. And, basically, I think at that time Randy Allen was suggesting to him that it might be in his best interest to resign. Now, interestingly, and I think this is interesting, Yvette Jones, according to her testimony, she received a phone call from the district's human resources officer, a woman named Michelle Belinsky, on January 10th, and was told they're going to fire you. Same story that Jason received. They're going to fire you. Be prepared to be fired. I think two days later she was called into the administration office, and she went there. In the interim, she had called the superintendent of the district, a woman named Carrie Ruby, and talked to her about what was going on. According to Yvette Jones' testimony, when she arrived in the district offices, they had her packet that said she was going to be terminated, and they discarded it and told her, you know what, we're going to suspend you for a day. So, you know, our view of the evidence is you had these two different people who both went and told these individuals that they were going to be terminated. Ultimately, Carrie Ruby decided to back off. Now, one of the concerns that we have, and they, of course, dispute this, but the idea of injecting sex or gender into what was going on here. I think that our theory of the case, and I think that the evidence supports our theory, or at least supports it enough that a jury can rule on it. Your voice is dropping too much. I couldn't hear you. That's not an amplification, just a recording. Oh, it is? Oh, please speak up. I apologize, Justice Steinman. Your theory, you were saying? Yeah. But I couldn't hear you. Okay. All right. And I appreciate that. I apologize. I did think it was a microphone. Our theory is that when this initially started, they thought that there was something going on between the two of them, some sort of an illicit relationship between the two of them. Clearly, that was not the case. Both of them have denied that. There's absolutely no evidence to suggest that there was. Well, give me some background. Even if there was a relationship, why would it be illicit in the first place? That was the term you used. Well, if it was maybe illicit is the improper term. Maybe I should say an inappropriate relationship for a school. I'm trying to choose my words carefully here. Go ahead. But this was a private office with the doors closed and the blinds drawn. I think that they were initially drawing inferences as far as what they thought was going on. Jason, of course, denied that there was anything going on. Yvette denied that there was anything going on. And I think ultimately that was probably the conclusion that they reached. But that didn't stop Carrie Ruby from saying in her recommendation letter that Jason had been flirting with Yvette and saying earlier during the questioning, asking Yvette, was he flirting with you? Yvette testified that she felt as though they were trying to get her to make a sexual harassment claim against Jason. And to us, these are uncertain. Yvette, would flirting be sexual harassment if it were true? It depends upon the nature of the flirt. There are certainly things. I feel like Ella's walking into the looking glass reading about all of this. What's going on in this case? What is all this? I'm sorry, Justice Steinman, I don't follow the question. Well, the whole thing sounds peculiar and remarkable. I mean, this is, what, 2015? 2013. 2000. 2000, okay. So there's a big investigation as to whether or not adults at a school staff might be flirting. Is this, that's a problem? Well, I think that it certainly could be. If there was some sort of a romantic relationship or a romantic liaison going on, it could have been. I'm sure Mr. Hennessy will be able to explain why the school district is all concerned about this. Go ahead. Well, and I think what the school district would tell you ultimately is that their concern was that we have this security officer who was supposed to be available and ready, and he wasn't at the ready. And I think that's what they're going to tell you their concern was, which could make a great argument to a jury, but it might not. And our view is that argument should go to a jury because we don't think it's true. One of the things that they raise is they say, well, Sandy Hook occurred. In fact, the circuit court referenced the Sandy Hook tragedy, which had happened a month before, and said everybody was on heightened alert. Okay. But what evidence is there for that? If everyone was on heightened alert, wouldn't Randy Allen or somebody have sent out a message to the SROs telling them, we are on heightened alert? If they were truly that concerned about it, wouldn't they have placed an SRO or some security person at the district's elementary schools? Because us, after all, we're Sandy Hook. But they didn't do that. There was no change. That's an ex post facto justification. You had two people who were doing personal things that they probably shouldn't have. And later in the day, later in the day, the two of them, Jason was off the clock. She was on the clock. He was teaching her some self-defense moves in the gym. They found her in violation of the district's policy for abusing time for an hour. She built for an hour for time. Abusing what? Time. Time for an hour because she was on the clock when she was being taught these self-defense moves by Jason. And so you have two people here who both were involved in the situation where they were doing things that they maybe shouldn't have been doing, arguably. It's a misuse of time. And probably both of them could have been disciplined over it. Termination is too significant. But if both of them had been terminated, we wouldn't be here because, as the circuit court noted and as the law notes, the law is not to sit as a super personnel agency. But the problem with that trope here is this case, there's a difference. There is a difference in the way that these two were treated. And that's the problem. And we believe, based on the way the law is established and the facts of this case, a jury should have been allowed to make the determination of whether this was discriminatory. And so we would ask that this court reverse and remand this matter with instructions that a jury trial be held. Thank you very much. All right. Thank you, Mr. Baker. Mr. Hennessy. Good afternoon, Justices. May it please the Court, Mr. Baker. I want to address a couple of things right off the bat. I think we just heard a concession that we have a security guard not doing his job. And that drives right into the issue of the prima facie case that must be established pursuant to the McDonnell Douglas authority that we all agree applies to this case. The trial court correctly said two of the four prongs are missing. The first prong is discharged despite adequacy of the work. He just conceded the work was not adequate. Mr. Hansen, on January 7th, asked Ms. Jones, can you fix my personal computer? I'm having trouble loading things on Craigslist to sell. On January 8th, he brings in his computer, ends up in her specific office locked for up to 45 minutes while she goes about and does other things that are undisputed, fixes the computer lab, takes calls, does other things within her job duties in her workspace. She violates her job duties to an extent, he violates his job duties to a greater extent, and he fails to establish the prong that he was discharged despite adequately performing. Now, there's some discussion in the appellant's brief that he's had this long history of good performance. Again, that's undisputed. He was a good employee for many years, part-time. Nonetheless, he was a good employee. To me, that points even greater to the extent of his violation of his job duties and the significance of the action taken by the school district. So why was he fired? He was fired because he is the only armed security guard in that school, and I would remind the court that a prerequisite to that job was to be an active or retired police officer. His job was to be a security presence. Those positions were created in the aftermath of Columbine, and the argument that Sandy Hook is irrelevant to a security guard in a school is, quite frankly, unbelievable and weighs upon his ability to do his job if he didn't pursue it. Why was he fired? He was fired because he did not perform his job on that day, and he had a supervisor. So for 45 minutes he was in an office doing the computer? Working on his personal computer, yes. He had a supervisor, Randy Allen, and there's a lot of evidence that I'll get to about Randy Allen and his supervision of Mr. Hansen. Randy Allen, it's in his written job duties, it's his job to evaluate and recommend hiring and firing those SROs. He was in all of the investigation meetings that took place that included only Mr. Hansen. He was there with the assistant superintendent and the director of human resources until the final meeting that also included the school principal and the superintendent herself. He evaluated those things, and we have sworn testimony from him saying, I lost trust in my SRO. He was not based at the middle school, so he could not, on a day-to-day basis, watch Mr. Hansen and see what he did. He had officers in six schools, and he had to remotely supervise them. So he said in his sworn testimony, trust is of the utmost importance in his evaluation of that, and based on these circumstances he lost trust. And it's not only the dereliction of duty that day is the key reason he was fired, but thereafter an investigation was launched. It was January 8th that it occurred, it was January 10th, that Randy Allen called Mr. Hansen and said, I've got to meet with you. He went and met with Randy Allen, the assistant superintendent, and Ms. Kissel, who was the director of human resources. And in that meeting, the first thing he talked about was security cameras. What was what? Security cameras. There were issues with security cameras that he had to talk to Ms. Johns about. Then, to jump ahead to the injection of sex into this matter, it's quoted in our brief, he started asking about, am I here for a sexual harassment issue? He couldn't recall 48 hours earlier that he had been locked in that office for 45 minutes. Randy Allen also swore that that was part of the reason he lost faith in him. He couldn't recall 48 hours ago when it happened, and he viewed him to be untrustworthy, that he was misleading him. And Mr. Hansen will tell you, oh, you know, I made a mistake, or I couldn't recall. And that may be true, but that's not what matters. What matters is the perception of the decision maker in recommending this termination. Whatever Mr. Hansen says can't change the perception at the time that the review board, which was Mr. Allen and the other administrators at the school district, they viewed him as being uncooperative and untrustworthy. And immediately after that meeting, they instructed Mr. Hansen, do not contact anybody else involved in this investigation. Do not contact Ms. Johns. What happened? Ms. Johns' cell phone that was sitting on the desk started buzzing. Mr. Hansen was calling her. He said in his briefs in this case, it was an accident and I was trying to call my dad. We'll never know for sure whether that's the truth. That's what he says. But that's not what matters. What matters is Mr. Allen and the other administrators perceive that as an uncooperative security guard. All of those things wait on Mr. Allen. And that day, he recommended this termination. At 315 that day, he went and met with Mr. Hansen by himself and said, you're a police officer. It might be best for you to resign. You're going to be fired. It's out of my hands. Why was it out of his hands? It was out of his hands because he had recommended it to the assistant superintendent and the director of human resources. We heard Mr. Baker talk about how he can't be a supervisor because Carrie Ruby, the superintendent, is the only one who can recommend firing to the board. Based on that logic, every single employee of Chatham School District is Carrie Ruby's employee, and there are no other supervisors. What about Mr. Baker's arguments concerning how Ms. Jones was going to be fired too and then that was changed? A couple of things. First of all, it's immaterial. Each of these cases are evaluated on their own merits. What did Ms. Jones do? She was investigated by the same team with the exclusion of Randy Allen and the addition of Chad Kent, who was the director of technology. So we have the director of security in the meetings with Mr. Hansen, we have the director of technology in the meetings with Ms. Jones. Separate investigations, separate violations of their duties. Don't forget that Hansen goes to her office, gives her his computer, and is sitting there. While that's happening, a teacher comes, gets Ms. Jones from her office, and this is in Ms. Jones' office, not in Mr. Hansen's office. Ms. Jones leaves her office, goes and fixes a computer lab, comes back. Mr. Hansen's remained there the whole time. Once she's back, she testified that she took calls, she did other things, pursuant to her job, all while Mr. Hansen was completing his Craigslist needs on his personal computer. And then at the end of that, he left. So whether or not Ms. Jones, I'm sure both Mr. Hansen and Ms. Jones were evaluated on many different options. Suspensions, firings, etc. But the bottom line is we have undisputed facts, sworn testimony, from the director of technology and the director of security. Director of security, lost faith in Mr. Allen. He recommended to Carrie Ruby and Joe Larson, the assistant superintendent, he needs to be fired. I can't trust him to be the armed guard in this building. Then we have the director of technology, Chad Kent, saying she's a technology employee, I can lock down her computer, I can monitor her more closely, and I trust her. And I think that she can continue to be employed. Totally different decision makers. Totally different violations of their job duties. They definitely both violated their duties. She was suspended. In her written reports was the checking out late that day. That was considered and enforced in suspending her for a day. So whether or not she was fired, really, if she hadn't been fired, we wouldn't be here. If Mr. Hansen hadn't been fired, we wouldn't be here. As he said, the reason we're here is because one was fired and one wasn't. But it's not as simple as they both worked on a computer. That's not what happened. And that's undisputed. No question about that. So you claim they had different jobs and different circumstances? As noted by the trial court in its order, Justice Eggman, yes. There was no overlap at all in their job duties. And we've listed them, both of their job duties, completely in our brief. Her duties were to be in her office and work on technology issues. She wasn't supposed to be working on personal computers, which is obvious, and she violated her job duties to the extent that she did that. Mr. Hansen was to remain highly visible, to patrol the hallways, to be a security presence in that school. And that's the bottom line. And they had different people overseeing those issues. So the second part of the other prong is the similarly situated employee prong. And that's the Coleman v. Donahoe analysis that we heard Mr. Baker go into. And Coleman could not be further from this case. The facts of that case are compelling. We had two white men take a knife to the throat of a black employee. They were not fired. Thereafter, we had a female African-American employee tell her therapist that she fantasized about killing her boss. She was fired. And those employees all had the same decision-maker in the same division of the company. They were not in different divisions of technology and security, and they did not have different decision-makers, Allen and Kent. And that was clear in that case. Those facts alone are highly distinguishable from the case we have here. But also, the conduct in that case were threats of physical violence. They had nothing to do with the performance of job duties. They were aberrant, violent conduct and thoughts. Here we have whether or not they were doing their job and the extent to which they failed to do their job. And they both failed in a different extent. And then also, as the trial court noted, assuming hypothetically that the prima facie case were stated, we have the McDonnell-Douglas swinging door here. The burden shifted to the school district. It's conceded in the briefs. The school district had legitimate reasons for terminating Mr. Hanson. It's in the complaint. So we come back to the issue of pretext. And when you look at pretext, the standard is very important. Mr. Baker said you don't have to have a smoking gun, but you do have to have evidence of pretext. It's not just in the ether and on the whims of a juror. The case cited in the reply brief, Mills v. Health Care Service Court from the Seventh Circuit, states that the plaintiff must produce evidence from which a rational prior effect could infer that the company lied about the reasons for firing him. We have to have evidence that you could infer the district is lying about the fact that it fired him for not doing his job. It simply doesn't exist here. The Loudermilk decision from the Seventh Circuit describes it as a fishy reason. It's the reason fishy. It all comes back to the super-personnel board language that Mr. Baker referenced. We're not here to re-evaluate their view of the evidence. It's like a discretionary appellate case. You're not there to re-digest and re-litigate and re-decide what the punishment should be. We're simply to see if there was pretext and that it was motivated by his gender, which simply there is no evidence. What little pretext is discussed in the briefs is pretty simply put aside when you look at it. Mr. Baker has suggested that Sandy Hook evidence is lacking. I already mentioned, it goes without saying, this happened less than a month prior. And if you take the winter break into effect, Sandy Hook was about a couple of weeks, about 10 days of school prior to this incident. The deposition of Randy Allen describes in detail, as quoted in our brief, how significant that was to the parents in the district and how many calls he had to take from parents and talked to crying parents about their fears as a result of that. So Sandy Hook was an issue. There's a contention that Mr. Hansen was truthful, which overlooks the fact that it's not only truthfulness, which again is decided by the people making the decision here. They thought he was untruthful, but even more, he clearly was uncooperative, calling Ms. Jones immediately after being told not to. And he clearly could not recall events that happened less than 48 hours prior. Again, a concern to Mr. Allen about his security officer being unable to recall events that just took place. There was a contention that Mr. Hansen didn't violate his job duties. I've already addressed that repeatedly, but I think it's pretty clear that he did on that day. There's been some discussion in the briefs that our response to request to produce number 18 conceded that point. But in fact, if you read our response to request to produce 18, it noted there was no written policy that we're pointing to that was violated. But, and I quote, plaintiff violated the employment policy common to all employers that employees perform the duties for which they were hired and not abandon those duties. The plaintiff was derelict in his duties to monitor hallways and the school for safety. The next issue is Randy Allen being a supervisor. I mentioned that before, but some of the things to consider. It was Randy Allen on the 10th that called him and said we need to talk. It was Randy Allen, with the assistant superintendent and the director of HR, that was in all of those meetings investigating this incident. It was Randy Allen that met with him personally on the 10th and said he might want to resign. It was Randy Allen that asked for his keys and his ID that day. He's had arguments in the brief that Randy Allen should have said something about Sandy Hunt. If he's not a supervisor, I don't know why he should be informing him about the significance of the school shooting that had just taken place. We also know that Randy Allen had him attend school functions and supervised him at those functions when they were there together. And finally, we know that Randy Allen, in his job duties, has the written requirement to recommend the hiring of these employees, as he did. As he swore that he did. And Carrie Ruby, the superintendent of the school, swore that that's what she relied upon in recommending his termination. I understand Mr. Baker's argument is in part that he may make a recommendation, but he's not the decider. Does that matter? That analysis required taking the position that Carrie Ruby is the decider of all matters. She swore in her testimony she was not the decider, that Randy Allen was the decider, and she recommended his termination because Randy Allen, pursuant to his job duties, recommended his termination. If Randy Allen hadn't said, he needs to be fired, I don't have faith in him, he would not have been fired. That was Randy Allen's decision to make. And he was supported by the assistant superintendent, the director of HR, and the investigation that led to that decision. And it raises the question, you know, there's written argument that Carrie Cox, the principal, because she signed off on his reviews, was his supervisor, but she was not involved in the investigation at all. Carrie Ruby was not involved in the investigation until the last meeting when she said, look, Mr. Hanson, I'm going to give you one last chance to resign, or else we're going to have to recommend your termination to the school board. And if you take that a step further, then theoretically the school board is the supervisor of everyone. Because it's not even Carrie Ruby that's doing the terminating. Because of the rules set forth for all school districts, the school board is actually terminating him. But again, it overlooks the fact that these employees have multiple supervisors, but there's one person pulling the trigger that determines whether they were fired. And we know it's undisputed in this case, in the sworn testimony of Mr. Allen and the superintendent, that person was Mr. Allen, and that recommendation was to fire him. We already addressed the consideration of firing Ms. Jones, and why that's immaterial to this case. There's a suggestion that Ms. Jones' conduct was worse. I think that flies in the face of the undisputed evidence that she was doing her job for a long portion of the time that he was hidden away in her office. And then finally, I already addressed the sex being put into this matter. We cited it in our brief. It's very clear. The first meeting on January 10th, they're asking Mr. Hanson, why do you think you're here? And he swears in his deposition, am I here because it's sexual harassment? And we put the entire quote from the deposition in there. What significance does that statement by him have? Because there's a couple of things. First of all, Ms. Kissel, as he's sworn his testimony, immediately said no. This has nothing to do with sexual harassment. They were trying to get to what they were talking about, which is him locking himself in the technology officer's office. But also, the fact that they may have asked questions of Ms. Jones about are you comfortable with Mr. Hanson, or anything suggestive of all sexual harassment, is absolutely required as a professional to ask those questions. If somebody comes into your office and says, look, am I being investigated for sexual harassment? You better find out if you should be investigating them for sexual harassment. Why is he bringing that up? And he notes in his deposition, which we quoted, that there were some concerns that she had accused somebody else of sexual harassment. So he had concerns about that. But ultimately, he's the one that raised that issue. They shot it down with him immediately. They may have asked a couple of questions of Ms. Jones, but nothing that comes even close to a sniff of an inference of pretext, and that they didn't fire him for the reasons that they stated. And last, I'll just note that Mr. Baker, in his brief and argument, makes the contention that there's disputed facts that were resolved by the trial court in this case. I think if you take a look at the trial court's order, it's quite clear there weren't. There's very few facts established, because there's only very few that are necessary, and they're all undisputed. He was a resource officer, had the duty to be visible. He was in a security position. Mr. Allen had authority over the security officers as the director of security. Jones was supervised by Mr. Kent, the director of technology. They were in the office, as they agree, up to 45 minutes. The investigative teams varied based on Kent and Allen being switched for each employee. Allen lost trust in Mr. Hanson, as he swore, and Mr. Kent maintained trust in Ms. Jones, as he swore in his testimony. Those are the facts in the order. There's nothing disputed there, and that's what the trial court correctly relied upon in the graining summary judgment for the district. And with that, I would ask that you do the same in affirming the trial court's decision. All right. Thank you, Mr. Hennessey. Thanks, Mr. Baker. Thank you, Mr. Hennessey. May it please the Court. I want to go back to something Mr. Hennessey just said, and that is there is no dispute of fact, and it's uncontested that Allen made the recommendation. Well, it's not uncontested. Yes, he testified to that in his deposition, but Jason also testified that Mr. Allen said something very different to him when the two of them met, and I will read the way Jason described it. At approximately 3.15 on the 10th, Randy Allen entered Hansen's office at the middle school. Allen proceeded to ask Hansen a couple of questions and then told him that he was being suspended, and that, quote, they're going to fire you. Hansen responded by saying that that was totally unfair and asking why. Allen's response was, they don't believe you. When Hansen inquired as to who was going to terminate him, Allen responded by telling him that it was Carrie, Jill, and Michelle. Allen then suggested to Hansen that he would probably best, if he were to resign his position, because it could be harmful to his career if the sheriff were to find out about what had occurred. Hansen rebuffed Allen and told him that he did not do anything that warranted his termination that the sheriff's office would encourage him not to resign. Allen then told Hansen that he couldn't do anything about the decision to terminate his employment and that it was out of his control. Mr. Hennessy just told you and reaffirmed that Mr. Allen said it was out of his control. It was out of his control, or at least a jury could permissibly conclude that it was out of his control. And after all, that's what we are focusing on here. The question of what is a jury, what can a jury conclude? And based on this record, a jury would not be compelled to find in favor of the defendant. I want to go back to one of the legal issues that was raised by Mr. Hennessy, and he said Hansen's case falls right off the bat because he wasn't performing his job adequately. Therefore, he loses. That simply is not the case. That suggests that the law doesn't apply to bad employees. It does. It does apply to bad employees, and that's the whole point behind the Coleman and Donahoe decision. You had people who did have serious violations of policy. One was fired. One wasn't. The question is you're looking at two different issues, two different people being treated differently because of a similar issue. That's exactly what happened here. They want to say Jason's was worse. It wasn't worse. Later that day, a vet spent an hour where she continued to be paid, despite the fact that she was getting instruction from Jason when he was off the clock. She abused more time that day than he did. The suggestion that somehow this was a tremendous security issue, they haven't pointed to any policy, any rule that was violated here. This is what Jason did. These are what SROs do. They patrol the halls. He testified in his affidavit. He explained, I would frequently go into teachers' rooms and sit down and talk to them about personal things because one of the things that he was supposed to do was to build rapport with other stakeholders in the building, and that included the teachers. So for the reasons articulated here today and what was in our brief, we would ask that this Court please reverse the decision of the Circuit Court and demand this matter for a trial, and I thank you very much. Thank you. Thank you both. The case will be taken under advisement and a written decision shall issue. The Court stands in recess. Thank you.